woman for 40 years before she finally reciprocated his romantic overtures. In this case, there is no doubt Mr. Conlan was very persistent. There is no doubt he was not particularly eloquent. Maybe at some points he was even uncouth. But the question that is presented to you in our sufficiency challenge is whether or not the government adduced circumstantial evidence upon which a reasonable jury could conclude criminal intent on the part of Mr. Please let me say at the outset that we understand the dichotomy of, or duopoly I guess, of 2261A, the two-pronged requirement. We don't dispute that JMP testified that she suffered some emotional harm. She said she went to a therapist, and I'm sure that she did have emotional harm. The question is whether or not Mr. Conlan, based upon evidence of events that in and of themselves were not illegal, had criminal intent to cause that harm. We would argue that of course he did not. For instance, he would send many text messages, but he sent some that were flattering, some that were perhaps even offensive. But at the end of the day, what he still wanted her to do was to reciprocate his emotions. There was not evidence upon which there was intent to cause her to fear him, unlike cases where people have killed somebody. What if your wife had received, I don't know if you have a wife, but assume you do. How would you reasonably perceive that? Yes, Your Honor. I would tell my wife the best thing, it's kind of like that song by Taylor Swift, Shake It Off. The best thing to do would be to simply ignore it and to move on. When I was a child growing up, there were always the class bully, and my mother would always tell me that these people have no more power than you give them in your own mind. What about when he contacted church members and co-workers? Yes, I know he did contact the church, and he did at one point retract that, and then he called back and made some other comments about Ms. Dampe's reputation in the local community. Even then, though, Judge, again, I don't dispute that might have been uncouth, but how did that show that he had an intent to kill, injure, harass her? If anything else, maybe he was saying some nasty things about her, her professional comportment, but I don't think it rises to that level of criminal conduct as required under Section 2261. The answer to your question is I would not find this, I would not tell my wife, oh, this is, you necessarily need to, this is somebody who's intending, you should assume this is somebody who's intending to kill you. This might be someone, I think it goes to the point, Judge Owen, these were both J.N.P. and her husband, to a lesser degree, but both were public figures. That's how Collin got reconnected with her. She had this celebrity after the fact, and maybe this dovetails a little bit more into my vagueness challenge to the statute. As public figures, people are criticized all the time. Think about... But she was, that really, that might have been the spark or the ignition, but his affections for her dated back to high school. This was very personal. They had dated in high school, yes. There's no doubt. They had dated as teenagers about seven years before then. So he wasn't, she wasn't a total stranger to him in that. No, but this was a personal thing for him and her. Oh, yes. He wanted to, there's no doubt, he wanted her to reciprocate with romantic feelings, I guess implicitly to leave the husband. But that in and of itself, Judge, is certainly not good behavior in a moral sense of trying to convince someone to be engaged in infidelity, and yet it does happen, and yet that's not criminal. I would point out, Judge Owen, and I guess even if, my argument would be even if you found the evidence minimally sufficient from the, with regard to the sufficiency argument, that still the problem is, under the statute, doesn't give a person of ordinary intellect fair notice as to how they might go about aggressively trying to get someone to reciprocate romantic affections, even if initially that might be rebuffed. There's no, it's not like under the statute it says you can ask someone out three times, and after they say no, then you're barred. The question is, what about conduct, posting on blogs, for example, that are public figures, suddenly you can criticize a career advisor, criticize the husband's musical performances. If that was illegal under this statute, going on to RateMyProfessor.com or Amazon.com and posting negative book reviewers, certainly in our political discourse, Your Honor, criticizing an elected official's vote, you're certainly, and you say something nasty and horrible like, I hope you lose the next election, you're certainly trying to intimidate them, presumably to vote in some other way, are you even trying to harass them? And that's our argument that those key terms, harass and intimidate, are not defined under the statute. That's what makes it necessarily vague, such that somebody who engaged in legal conduct, certainly criticizing somebody, even saying something nasty about them, even driving across the state line, none of those are in and of themselves. Was there a reference to hiring a hitman at any point? Even then, Judge, in context to Joan, I would say no. That still reflected Conlon's desire to get her to pay attention to him, to get him to reciprocate in some way, to get some personal talking on the phone, not just the emails. At first she played coy, and then there was some emails, and then Officer King called. Even then, Judge, there was no, for the initial year and a half that he was speaking to her, he certainly, Conlon never hired a hitman, he simply made what we would characterize as some sort of an off-color joke. I would argue that under the circumstances, no reasonable juror could conclude that that was sufficient evidence of his actual intent to kill, injure, harass, all the other things under the statute, as opposed to simply trying, not successfully, but to get her to acknowledge him and to reciprocate him in some way. And if she had done that, I think it probably would have cured the situation, and you wouldn't have had a… She had the police, the detective called him several times, his family. He did call his family, yes. And the detective called him and said, leave her alone. I mean, he was not easily deterred. You keep saying that she led him along. I didn't read the record quite that way. I don't dispute that he called Officer King. Of course, he referred to Officer King, I won't say it here in the courtroom, but the same sobriquet that he had at one point said about J.P., the husband. But even then, Your Honor, I admit he wasn't easily deterred, but, again, that's not the question. Under the statute, did the government do circumstantial evidence that there was an intent to do all these other things? Maybe he would have done better to mind the police officer, but still does that rise to the level of criminal intent? Even if you were to disagree with me on those two arguments, Your Honor, the sufficiency and the vagueness of the statute, I would urge this Court to look very closely at our multiplicity challenge because that was sentencing impactful. It ended up adding three years to the aggregate sentence. We're looking at that under plain error standard of review. That's right, yes. I concluded that both the constitutional challenge and the multiplicity, as we acknowledged in our brief, that we're at plain error. And, of course, with regard to the constitutionality of the statute, the case law is clear, and we cite this in a footnote, the conviction upon an unconstitutional statute is plain error, as is a multiplicity sentence. You see this most often, Judge Owen, in the cases where someone is charged with the possession of a firearm and ammunition and they get a sentence. Hasn't at least one other circuit court held that this statute can be construed the way that the government contends? Yes. The only other court to consider the issue did find that the multiplicity challenge in that case was not successful. But, of course, the problem with both an as-applied constitutional challenge and a multiplicity challenge is that it's case-specific. What did Mr. Conlon do when the course of conduct is the unit of prosecution? There's no doubt we've been talking now for the balance of my time about Mr. Conlon's communications and interactions and so forth with J&P, the object of his affections. And yet there was another count that added all this additional time because of just a few stray comments that he made about J&P, who, again, was also a public figure. What's your best case under plain error review when this court has not addressed the issue, but another circuit court has and has come out against you, that we would recognize this as, assuming we agreed with your construction statute, what's your best case that says we should recognize plain error here? Let me look at my brief. I'll give you the exact case on rebuttal, Judge. I would just argue that the government's conception cannot be accurate. If no other circuit has considered it or only one other circuit has considered it, then that first circuit would necessarily foreclose any of the other regional circuits from ever finding that a statute was multiplicitous, even if they disagreed. I don't dispute that this other circuit is persuasive authority. It's another circuit court of appeals. But just because it's like a first-mover advantage, the fact that they're the first ones to say it, I don't know necessarily compels a result that nobody can capture plain error just because the circuit didn't move first. But let me look at my briefing, and I'll try to get you a best case on that. But I would urge the court to look. I don't dispute this one other circuit has brought it up, but at the same time under the multiplicity line of cases. And most specifically, Judge, there is no doubt that under 2262A, the course of conduct is the unit of prosecution the defendant must partake in. So even not looking at what this other circuit said, but just under multiplicity standards, we would argue that still the course of conduct under Bell and all the multiplicity cases that have been issued in the last 60 years from the Supreme Court, that that course of conduct, though, was still directed at JMP. The few straight comments about JP were not an entirely separate course of conduct to justify the imposition of the additional sentence. And in a lot of the firearms cases, Judge Owen, this court only reverses them as a multiplicity sentence for usually just the extra $100 special assessment or something, which is constitutional deprivation. But at the same time, it's not that impactful to the defendant here, but it necessarily is very impactful. It added three years to his sentence. Even if, Judge Owen, the court were to disagree with me on those three constitutional arguments, we would urge the court to look at some detail I'd like, with court permission, to seek into the Fourth Amendment challenge. And this, of course, is a bifurcated Fourth Amendment challenge. It rests both on the search of the room proper and under the subsequent problems with the search of the car, which, of course, the district court himself recognized. I think it's important to note, Judge Owen, Detective King, the officer in Austin Police who had spoken to Colin previously, was not present or even on the lookout for Colin the day that he got this arrest warrant issue. There were these other officers who were sent just to search hotels in the area. They, of course, lured him down under false pretenses to the room. Even if, under Chrisman v. Washington, the police officers were allowed to go with Colin back to the hotel room, of course, they found nothing dangerous on this person, and they got to the lobby, the question arises, what about the things that they saw when they went in? I don't dispute the police can make a protective sweep. They had another officer waiting there. I have no problem with any of that. The problem is, what is the immediately incriminating nature of the things that they saw in the room? In the government's response brief, they don't dispute with my contention that it's the reality of modern American life that laptops and cell phones are everywhere. Didn't they get a warrant before they actually searched the laptop? They did, yes. They did get a warrant six days later before they did the search. The laptop and I forgot what else into custody. The cell phone. The cell phone into custody. That's right. They did not search it or access its contents until they got a warrant. That's right. Now, that is, I would point out just with the point of the initial seizure, and they could have, I don't have any doubt, they could have gone and gotten a warrant for that room. There's no doubt Colin was being taken in. They asked him, do you want to go up to your room to get your stuff? And he said yes. That's correct, yes. Do you want to get your wallet and your keys? They didn't say, obviously, you can't take a laptop and cell phone when you get booked in. I mean, that's obviously a big problem. I would point out, though, Judge, the officer's testimony, and I'm looking at particularly both record page 917 and then again the testimony of Officer Murray at 931, and the defense lawyer asked very clearly a question. It was nothing obviously apparent with the phones or computer when you walked in the room that made it appear to be contraband. Answer, I would say no. Same question of Officer Murray at 931. So we talk about things that you seize in plain view. Well, they took it into protective custody. They didn't access it until they had a warrant. That's right. But the problem is the seizure of those materials in the first place. It shouldn't have been seized when they were taken at the time. There was nothing. Judge, even if I was wrong on that one with regard to what was found in the room, and my argument that the resulting search would necessarily obtain it, even more impactful, though, what Judge Yackel had more problems with was the search of the car, this ultimate, how the things were taken. Well, let's say we excluded evidence of the gun in the club. I mean, isn't there a lot of other evidence that he would have been convicted anyway? Well, certainly that evidence impinges most directly because it was specifically enunciated in that Count II. So the fact that they said a club and riot stick, there's no way they could have proceeded on Count II as written if that evidence had been suppressed. They would have necessarily been commenting on suppressed evidence. It's impossible. We would also argue, Your Honor, that was the evidence. If the jury was to have circumstantial evidence before, which, of course, we dispute that they did, but if there was any evidence with regard to the intent to kill, injure, harass, or intimidate, that gun and nightstick, which, of course, were legal. He was not a prohibited person. But those two pieces of evidence were the strongest pieces of evidence in the government's evidentiary quiver at the trial. That's why the harm analysis here is so incredibly strong. Without belaboring further on harm, Judge, let's point out that it's incredible. This exact situation is regarded as a paradigm under Lefebvre. I'm reading from Lefebvre 7.3c. If a person is arrested in or at his place of residence and his car is parked in the garage or lot, then the police cannot justify seizure of the car on the ground that such action is needed for protection of the vehicle and its contents. In this case, though, Judge, what makes it even more problematic is the fact that the police stated reason why they needed to impound and get that car out of there was that Conlon was going to be evicted. Not only were none of the three officers, Shelley and Mahaffey, the ones who testified, ever able to say or put any report that any agent of the motel ever told them that they needed to get the things out of there. The managers testified to the complete opposite. My time's up. I would just point out that it is an inextricably intertwined product. It's called a motel. The fact that Conlon had paid for the full next day, he had every possessory right to keep his car on that property and keep his things in that hotel room, Judge. Even the things they weren't trying to take out of there, there was no justification for putting those things in that car. That inventory search never should have happened. All right. Mr. Kretzer, you've saved time for rebuttal. Thank you. All right. Is it Meisler or Meisler? Meisler. Meisler. All right. I'll apologize to the Court in advance. I'm a little under the weather, so I hope to enunciate clearly. But if not, I hope you'll let me know that I'm not doing so. Good morning, Your Honor. Scott Meisler on behalf of the United States. Going to some of Judge Owen's questions, I think there are actually a lot of very simple, straightforward ways to resolve some of the issues in this case, given the standards of review. So I'm going to try to go quickly through some of the issues that Mr. Kretzer has raised on Mr. Conlon's behalf and try to explain to the Court, obviously, why I think they lack merit, but also why I think there are some very straightforward grounds that the Court doesn't have to actually reach constitutional issues and whatnot. The two that come to mind are both the vagueness and multiplicity challenges, as Judge Owen indicated. Those are both on plain error. As to vagueness, three other circuits have looked at this issue, on the vagueness challenges, and all have rejected the vagueness challenge to 2261A. And so absence, and we cited the Howard and McRae cases from this circuit, which both, in a plain error posture, looked at that situation and said where other circuits have rejected a vagueness challenge and there's no contrary precedent from this Court or the Supreme Court, the error can't be plain. And the second issue about vagueness, of course, is that when one's conduct clearly falls within a statutory prescription, the vagueness challenge can't succeed. It's not like an overbreath challenge in the First Amendment. You have to show that the statute is vague as applied to your conduct. And for some of the reasons that Judge Owen mentioned, I think it's quite clear that Mr. Conlon's extended course of conduct here, in which the key facts were that he escalated in the face of warnings from family, law enforcement, and the victim to desist from the conduct, and culminated, of course, in that interstate trip when he was armed in his car with the riot club and the gun. That clearly falls within the statute and is quite similar to the fact patterns that the First Circuit, the Ninth Circuit, and the Fourth Circuit had before it in the cases where those courts rejected vagueness challenges to Section 2261A. As to multiplicity, again, as Judge Owen mentioned, the only case on point is the Fourth Circuit's analysis in Schrader by Judge Wilkinson, and the Court looked at the text and structure of the statute, pointing out that both the intent and effect prongs are key to the person as a textual matter, and that the punishment is actually graded to a person. So you can easily imagine a scenario where stalking conduct is directed at a husband and wife or a mother and daughter, and that different harms result to them. Maybe one suffers serious bodily injury, but one doesn't. Under the statute, that would be punishable by different ranges. What's the best evidence that he was stalking the husband? Well, the best evidence he was stalking the husband was that the indictment charges at least one specific communications directed at the husband on the blog post where he commented and referenced chickenhead hunting in Texas. I think that both victims testified they understood that as a reference to the husband because he was a musician. So in some of the text messages and emails referenced musicians and a Johnny Cash wannabe. So some of those were directed to J.M.P., the female victim, but the understanding was, and Judge Jagle explained this when he denied the Rule 29 motion at the conclusion of evidence, that of course those would be shared with the husband, and that because there was at least one or more, at least one that I recall in the indictment, Your Honor, one communication directed solely at the husband via Facebook, it was clear that common contemplation. Where was he threatening or showing intent to do what the statute says as of the husband? Right. I think at least the one communication and that there were. That said what? The communication, it said it referenced seeing the victim's husband's mother in a porno movie and asked if he was scared. And then that echoed some of the text messages he sent where he asked J.M.P., the female victim, whether her husband, who he called Princess, was ready for a face-to-face confrontation. So he sometimes used J.M.P., the female victim, as a conduit to get messages, I think, to the husband, but there was at least one communication that was charged in the indictment that was directed specifically at the husband, not through J.M.P. at all. And then again the blog post, which was on a comment in a public forum in the blog post referencing chickenhead hunting in Texas. So those were two communications I think that were fairly, one was directly to the husband, and one was, of course, a spot where he would easily see it. And again that is on plain error. We cited the Garcia-Gonzalez case, which is a recent situation which this court had before the statute in which no court had construed the unit of prosecution, no court had resolved the unit of prosecution issue, and so the court declined to resolve it and just held that any error was not plain, and that involved an alien harboring statute. On the sufficiency of the evidence, I think some of the evidence I mentioned I hope will dissuade you from any concerns the court had. But I think this is, again, in line with some of the cases we've seen from other circuits. It's a domestic situation. As Judge Owen mentioned, it's a personal situation that escalated from sending of flowers, a first ominous message, warnings from the family, warnings from the police, references to the victim's address, and then following through on those. And again, it's not just one instance of approaching the victim and her family. Also recall that Conlon went to her parents' house in Missouri, and her father testified he was immediately alarmed and scared and went to get a weapon. That's how he approached it in that sense. So it was obviously terrorizing not just the victim, not just her husband, but even including her family. And then, of course, after he was arrested on this offense, he continued to direct mailings to the victim and her family, one mentioning her sister, an inmate marriage proposal sent to the victim's sister, and then additional, one final mailing to the victim as late as March 2013. So this kept going, and again, I think in the face of the warnings to desist, the jury could quite clearly infer the necessary criminal intent, especially because they heard the conversations with the detective. They heard the voicemail messages, which are on the record before the court as Government Exhibit 1 and Government Exhibit 6A and 6B. So if the court has any concerns about that, the jury, of course, heard the intonation and heard whether a reasonable person would infer a threat and harassment from those communications. On the suppression issue, I agree that it makes sense to look at it in kind of two time frames, one as the hotel room and the seizure. And as Judge Owen indicated, we're talking about a plain view seizure, not a plain view search. There was a search later on, a few days later, pursuant to a warrant. And so we're talking about a plain view seizure. Was there probable cause to believe that those items were evidence of a crime, evidence of a crime? And we look at the collective knowledge of the officers. And I think Mr. Kretzer's argument here speaks a bit to kind of the temporal aspect of it. Do the officers have to know the second they see it that this is an item they can seize? And this court's decision in Waldrop, I think, that we cited in our brief, about the collective knowledge doctrine, how it applies in the plain view setting, refutes that. Waldrop was a situation where guns were seized and they were incriminating in nature. Guns, of course, can be held lawfully. They were incriminating because the defendant there was a felon. But the two officers who led the execution of the search didn't actually know that at the time. They found that out immediately after the search. But applying the collective knowledge doctrine, this court held that the probable cause standard was met. We think the same is true here. We're not asking for a rule in which electronic devices can be seized routinely, no matter the nature of the offense. But we're talking about an offense, a stalking offense, interstate stalking, that involved email messages and basically was perpetrated through electronic means. And Detective King, of course, knew that. We think you have probable cause to seize, just as you might have probable cause to seize items in an identity theft case, where the identity theft was carried out by someone printing fake IDs from a computer and printer. A computer and printer by themselves may be innocuous, but if the officers who were executing the arrest warrant see those items there and know what the nature of the offense is identity theft by fabricating manufacturing items, in those cases there would be probable cause to believe those were evidence of the identity theft crime. We think the same is true here with respect to the laptop and the cell phone. The last point I'll mention, again, is something that Judge Owen had hinted at, but I think this is a very strong harmless error argument. Again, if the court doesn't want to reach these issues, we think the evidence was really compelling, even without the gun, even without—sorry, let me go back for one moment, Your Honor. We mentioned, Mr. Kretzer read from the Lafayette chapter about the community caretaking impoundment of the car. The district court's ruling here was actually quite different than that. The court did have some trouble with the evidence at that point and did invent some confusion about what had happened and with whom the officers had spoken at the motel. So the court actually resolved this case based on the Cooper line of cases from this court that a vehicle that's an instrument or evidence of a crime can be seized under a probable cause standard. So the judge found probable cause to believe that the vehicle, which, of course, had— a vehicle which Mr. Huntley had driven across state lines, driven to the victim's house, and that sighting of him there had prompted the arrest warrant in the case, that that vehicle was probable cause to believe that vehicle was evidence of or an instrumentality of the stalking offense. So that's the ground the district court ruled on. What about the manager's testimony? I thought I read in your brief somewhere that somebody did testify, or maybe it came in through hearsay, that somebody at the hotel did say, we get his car out of here and him, he can't lodge here anymore and we want his car gone. What was the evidence on that? Yes, the evidence was, and this was in—the evidence was basically threefold on that point. First, in the officer's report, and I'll just take one step back. Factually, because of the competency proceedings in this case, the suppression hearing happened over two years, about two and a half years after the arrest. So the officers were testifying sometimes to things that had happened quite a long time ago. But the officer's report contemporaneous with the arrest indicated that the motel manager had told him the car could not be left on the property, so it was impounded. I think that's at age 895 of the record. And did any motel manager testify to that effect? No. The officers testified that—Officer Sheffy, who had the conversation with the manager, testified consistent with his report that that's what had happened. It actually was recalled to give some more details about that, where the conversation with the manager took place. Later, the government didn't really—didn't, I think, anticipate this would be an issue. It wasn't really raised in the motion's briefing. And so when the hearing was continued for argument on the motion to suppress, about two weeks later, the government proffered a statement from—without dispute, a statement from the motel clerk who'd actually placed the call to induce Mr. Conlon to come to the lobby. And that clerk's proffered statement was consistent with the officer's testimony. Her statement was that she had heard a manager tell the officers, this guy can't stay here anymore. Put him on the do-not-register list so he can't stay here and get his stuff out of here. So that was the evidence at that point. And I think we feel comfortable under this Court's precedence in the Gravitt case, in Davis, in Stoller, that when out-of-state defendants are at a motel, that's a reasonable basis for impounding the car under the community caretaking function. But again, the ground the district court ruled on that is a straightforward ground that Mr. Conlon really hasn't challenged is that there's probable cause to believe that the car was an instrument or evidence of a crime, and that's the Cooper case cited in our brief. How is the car an instrument of the crime? I mean, you really ended up searching, and what you used was what was inside the car after search, not the car itself. That's correct, Your Honor. But I think the car was an instrument of the offense because it's what Mr. Conlon used to cross State lines and show up at the victim's house, right? So it's part and parcel of the stalking offense. If we consider him showing up at the victim's house a key part of the stalking course of conduct, the car itself, I mean, you can imagine a scenario where Mr. Conlon could have challenged it at trial and had to produce a picture of the car, for example, of what car did you see him driving, and the government could have had to prove up if it was contested that that car with that license plate was the one the victim's husband, J.P., had seen outside their house. So I think that's how it was an instrument of a defense. And I would just note, Your Honor, that, of course, the search of the car was an inventory search, and I don't think Mr. Conlon has contested that the inventory search was pursuant to the standard Austin Police Department practices that this court upheld in the Ponce case cited in our brief. So we're looking at the impoundment and the inventory as kind of two separate Fourth Amendment issues. The inventory isn't challenged. That's kind of the sequence of events that happened in the Florida v. White case in the Supreme Court that was seized as a forfeiture in that case, but then the evidence came in pursuant to an inventory search. So the same sequence of events here. We have an impoundment either as a probable cause seizure or community caretaking impoundment, followed by really unchallenged inventory search pursuant to Austin Police Department rules. The last issue that I wanted to address, again, just that hasn't been emphasized by Mr. Conlon and it's changed a little bit in the briefing, is the speedy trial issue. And those issues are kind of notoriously fact-specific. One might say a little bit boring sometimes because you're basically doing a mathematical clock. But I was just going to say that I think there are some kind of tricky issues that we flagged in there that district courts are divided on about how the transportation delays and issues like that are resolved. And one easy way for the court, again, to avoid that issue is to follow the analysis on page 38 of our brief that if the court discounts the ends of justice findings and agrees with Mr. Conlon about that first period of transportation delay, you still get to 51 days. And so I think the court can assume without deciding some of the issues that he has raised in his opening brief and still get to a total well below the 70-day statutory limit. And on the ends of justice exclusions, we pointed out that one of them, the Diggum case, is consistent with the seven-month open-ended continuance. The other one, which, candidly, Your Honor, I just realized in preparing for argument before the court, the other one is a little bit trickier because it's an ends of justice exclusion that looks both forward, prospectively, and retrospectively, and I'm not sure this court has actually addressed that, but whether you can have an ends of justice exclusion that looks both forward and backwards. And so, again, that's all the more reason, I think, it has been briefed, all the more reason, I think, not to get into that. And if the court agrees with the analysis we have on page 38 of our brief about how those numbers break down, it could assume without deciding Mr. Conlon is right about some of these issues and still find a number of non-excludable days that was well below the statutory limit. On the self-representation claim, am I correct that there's no published opinion from this circuit that deals with a self-representation request that's made or that's found to have been made for purposes of delay? Would we be plowing new ground on that? I think that's right, Your Honor. The most recent one I found from this court was the Vernier unpublished opinion cited in our brief, and that referenced an older case in the 70s called Chapman, but the discussion in Chapman was very brief. I mean, certainly it would be the first modern case, my understanding, but I think it's a well-accepted proposition that last-minute requests that the district judge finds to be for purposes of delaying or manipulating or making frivolous arguments the court has already rejected is a basis for rejecting a last-minute request for self-representation. The court cited the Fraser L. case that's also in our brief and a case out of the Tenth Circuit called Makovich, which is similar. So I don't think the court would be plowing new ground nationally, but it may be certainly the first modern opinion in which this court had addressed that exact issue. Was his testimony at trial that he wanted a lawyer that would do what he told him to do, not that he wanted to represent himself solely? What was — I was a little bit confused about the evidence. Yeah, I think he — Mr. Connell, I think, was a bit equivocal about it. What the judge found, and I think this is accurate, what the judge found is that almost — I think all of his requests to represent himself throughout the trial, either in letter form or before the court, had been tied to dissatisfaction with counsel. And this court's case law has been clear that we should distinguish between a genuine request for self-representation and dissatisfaction with counsel. And so I think that's what the judge found here, is that Mr. Connell never expressed a true desire to represent himself, never believed he could provide the best defense. It's that, as an alternative to a lawyer he was unhappy with, he was willing to represent himself. And his last request, I think, specifically said, in the meantime. So he contemplated being appointed a new lawyer. He just wanted to assume self-representation in the meantime. And again, I think the Burton case both sides have cited indicates this court really indulges every presumption against waiver of the right to counsel in favor of self-representation. I think that's what the judge was doing here. I think if you look at the discussion, the judge made an oral ruling, but it's a very extensive discussion culminating in the judge's ruling at pages 1066 and 1067 of the record. It's a very extensive discussion. And Judge Yackel reviewed the entire history of the case and made his determination to reject the motion in the context of that entire case history. If there are no further questions, we will rest on our brief. Thank you, Mr. Miser. Mr. Kretzer, you've saved time for a bow. I'll take up first the point that Mr. Miser talked about last. Judge Owen, I'm looking at page 1036 of the record. This is on the FREDA issue, Judge Smith. The court, all right, well, are you prepared to go to trial on Monday, August 19th? Colin, well, I am, yeah, why wouldn't I be? On the next page, page 1037, Colin, well, I guess we go to trial on Monday then. The court, all right. I understand that he was perhaps the—wasn't always necessarily the most lucid or consistent in how he said he wanted to represent himself. But under the controlling standards of FREDA, we would argue he did make, at the relevant point in time, Judge Smith, the unequivocal waiver of the right to be represented by a lawyer as required under FREDA. And at that point, Colin, of course, would have been in the situation of stepping into the procedural posture of the case as it had happened where certain rulings had been made and so forth. But he did have that right. Turning back to the Fourth Amendment issue, on the collective knowledge Ventresca-Whitley fellow agent rule, I would argue, Judge Smith, that under the situation that you have here, the officers who made the arrest, Murray and Sheffy, had not been endowed with that information from Judge King. I'm looking at page—from Judge King, from Officer King. I'm looking at page 931 of the record. Question, nor had you been given instructions to seize them or look out for them before you talked to King, right? This is, of course, of the things in the room. Answer, yes. Question, the BOLO, the beyond the lookout, says he may be armed, mentally unstable. Be careful. Answer, yes. Question, doesn't say anything about looking for evidence of any crime. Right. No, sir. Similarly, on page 956 of the record, this is regard to Miss Bonnie Mondragon, who, if I'm saying her name correctly, who's the woman that the prosecutor went and spoke to in between the first hearing on the suppression motion and the point in time in which Judge Yackel heard argument on it. This was Officer Sheffy. On direct examination, the court, Judge Yackel asked, did you previously say it was a female manager who placed the call, the witness? I don't remember who placed the call. In spite of the fact, Judge, that obviously Judge Yackel was concerned that none of the officers knew anything about who told them on this occasion. The first officer who testified said, well, I've been to that hotel before and somebody had told me that you're not allowed to keep your things there if you've been arrested and you must be kicked out right away. None of those officers could tell him who, on this occasion, told them that was Motel 6's policy. And moreover, the two people who were called from Motel 6, especially the actual manager in the lobby, who was the one who made the call for Conlon to come down to the lobby under that false pretense, he was unequivocal. I quote from his language in the brief. He said, I don't bow down to any police officer. I know what our policy is, that nobody was going to kick him out while he had a valid stay. Most importantly, Judge Owen, and I'm very used to suppression hearings where district judges make adverse fact findings. Of course, they have to be reviewed in that light most favorable. But Judge Yackel specifically did not find that that was the case here. I'm looking at page 103-1 of the record. This is the sentence before he said the evidence is very sketchy here. This is, of course, the second hearing where he actually made his ruling. Quote, I do not find that the statements that the police officers placed in the report showed that a manager, because there has not been an identification of anyone who was in fact a manager, told them that Mr. Conlon would be evicted and that they would tow his car. In other words, the inventory search, I don't dispute the government's case that this court has previously said the Austin Police Department's internal protocol on inventory searches is not itself unconstitutional, but certainly the Austin Police Department cannot irrigate to themselves the ability to get around the Fourth Amendment just by having a protocol there. There's nothing in this case that said that before you even got to an inventory search that these things needed to be taken from the hotel room and placed into the car, much less the things in that car, i.e., the gun and the nightstick, which were underneath the floorboard, needed to be inventoried. And that is not, in fact, what Judge Yackel found. His actual holding is on the next page where he, after identifying the weaknesses in the government's case, he just said, quote, as a result of the inventory search, they would have found the weapon and the nightstick regardless. But again, it's our position at the risk of redundancy that there should not have been this inventory search in the first place because Mr. Conlon, unlike a lot of the other cases where there have been inventory searches of the cars or the community exception where somebody is traveling away from home, his car was not going to be towed anywhere in the relevant time horizon. Certainly, Judge Owen, it was not going to be taken under the warrant with the relatively low $10,000 bond that existed as of the time those officers made the arrest. Even if it's true that Mr. Conlon ultimately never did bond out, as we know, and has been in custody ever since, he could have simply arranged for a friend to come and get the things. He could have had a son from Missouri come and get the things. There was nothing that said that those things had to be taken out of that hotel room. That also further removes this case, we would argue, from situations where a car is in a public place like a parking lot in a mall or something where you don't have a possessory interest like he did incident to his contract with the— again, it's called a motel because you can put your motor vehicle next to your room. All right. Thank you, Mr. Gretzer. Your case is under submission. Next case.